We're here today on the issue of a disability discrimination case against the Department of Army. We believe that the lower court made a number of different... Excuse me, I'll ask you to pull the mic down toward you a little bit. There you go. Okay, sorry. We believe the district court made a number of errors in their decision, the first being the dismissal of the hostile work environment claim on A12B6, and then the remainder of the claims being dismissed under a summary judgment under Rule 56. I apologize. I think the hostile work environment was... The court described it as a series of disjointed, uncomfortable interactions. When you look at the totality of the circumstances, which is what you're supposed to do, it was much more than that. It was a definite increase in microaggressions that caused the appellant to have panic attacks and to suffer from symptoms that she had not suffered from since being diagnosed with PTSD and anxiety. We believe that that decision should be overturned or should be reversed and remanded back to the district court to go through discovery. The disability discrimination, the interference, the failure to accommodate, and the retaliation claims were dismissed, as I said, on a Rule 56. Those would need to be reversed and remanded for further trial. The disability discrimination claim, the district court analyzed that under a Section 504. Section 504 does not apply to federal employment. Section 504 under the Rehabilitation Act applies to entities that receive federal funding, but Section 501 is specific to federal employment. The reason that that is so important is because there are two distinct differences. The first is that under Section 501, you do have a right to a jury trial. Under Section 504, you do not. Under Section 501, the second distinction is you only have to show that the discrimination was based upon your disability, whereas on a Section 504, you're required to show that the discrimination was based solely on your disability. And that's a huge distinction. When analyzing the differences between Section 501 and Section 504, it seems as if the courts are split among the circuits. This court in Hannah P. started out analyzing it under a Section 504, but did not make the disability analysis determination, and instead jumped to the McConnell-Douglas analysis of whether or not the pretext, whether or not the appellant could rebut the pretext. So what is the evidence that the plaintiff's disability was a motivating cause of the discrimination? We have a various number of ways that the defendant interacted with the plaintiff that she knew, the supervisor knew, would increase the plaintiff's anxiety. She knew she had anxiety. She knew she suffered from PTSD. Just knowing about a disability is not sufficient, right? We have lots of cases that say knowing about a disability doesn't suffice to show discrimination on the basis of the disability. So even accepting the lower motivating cause standard, what's your best evidence? The best evidence is the way that the defendant treated Ms. Smith in the workplace. She did things to increase her anxiety, knowing that it would increase her anxiety. She would wait for her at her cubicle. The supervisor would wait for her at her cubicle when she came into work, knowing that... Didn't the evidence suggest that she did that because she didn't like people being late? That was after the appellant had already filed an allegation of discrimination and asked for accommodations. So it really didn't have anything to do with her being late. In fact, there really was little evidence that she was late. Wait, what is the discrimination we are talking about? We're talking about their attitudes toward her mental disability of anxiety and PTSD. Like attitudes aren't something you can sue over. You have to show she was discriminated against because of a disability. What's the discrimination that happened? The discrimination was treating her differently. She didn't wait for anybody... What's the adverse action? The adverse action is that it caused Ms. Smith not to be able to work. The increased anxiety amped up her ability to actually be at work. It increased the symptoms. She asked for accommodations. She asked to telework. She asked to be transferred. She asked for reassignment. But is she... I know she asked for accommodations, but there was... In her medical record, and I don't have the exact date, they said that there was no job that she could perform. That was much later on in the process. And again, this becomes part of the prolonged interaction between the defendant and the plaintiff in which she took short-term leave in order to discuss accommodations and what could be done. Those accommodations were never discussed. There was no interactive process. There was no discussion of, how can we make this place appropriate for you? And that then increased her anxiety and her ability to come back. There were a couple of times that she was able to come back and she was able to work when she wasn't on the same floor as the supervisor, but that process was significantly hampered by the defendant's actions. The defendant took her computer away from her. The lower court said, well, she's on leave. She doesn't need her computer. They did more than just take her computer away, though. They essentially wiped the computer and got rid of her emails and got rid of any evidence that she could use in support of the discrimination. You listed off a number of accommodations earlier, like telework and things like that, but I didn't see in your brief that you disputed the district court's ruling that none of that was considered in the EEO proceedings, that that was just transfer to a different supervisor was the accommodation that was requested, and then that's the only one that was exhausted in front of the EEOC. The transfer to a different supervisor was the one that was most vocal and was most discussed, but in all of the EEOC records, there was discussion of, I've asked for everything. I've asked to be reassigned. I've asked to be transferred. I've asked to telework. I've asked to do all of these things. So are you disagreeing with the district court's ruling that those were not exhausted? Yes. And where can I find that in your brief? I will look at that and get that back to you on rebuttal. So we also are claiming a failure to accommodate, and implicit in the failure to accommodate is a failure to engage in the interactive process. There was nothing that the defendant did in order to interact with Ms. Smith to determine what could be or would be an appropriate accommodation for her. And although she was asking for reassignment, there's no question she would have considered other types of accommodations, but it was very clear that every time the subject was brought up by Ms. Smith or by representatives from Ms. Smith, it was met with, no, we're not going to have that discussion until later. First, there was a 15-6, which is an investigation of a hostile work environment. They decided that they would not make any decisions on disability or accommodations until the conclusion of the 15-6. Ms. Smith was never informed when the 15-6 was completed. The records show that it was completed sometime in July of 2012. That information was never shared with Ms. Smith. And one of the recommendations was that Ms. Smith be reassigned. That also... So her, when she was placed on leave, you don't consider that as part of the accommodations due to her health? That was never a discussion. That was never a discussion of an accommodation. She was never set, she was never told, we recognize you have a disability, we recognize that you need an accommodation, here's leave of absence, here's a leave. The discussion was, we'll approve your leave, but we're not talking about disability until the 15-6 is done. But she could, but as a part of the leave, which I'll bring up again, I believe her doctor said that there was no job that she could perform, at least that's what her medical documentation is stating, so... The medical documentation as of October made that claim because she was on short-term leave. It was a two-week period. So every two weeks, Ms. Smith would go in and say, where do we stand with accommodations? What are we doing? How are we doing it? And it was, we're waiting on the 15-6. And she would go back to her doctor and say they haven't, they're not doing any accommodations and the doctor would give her another two weeks. So it wasn't a long-term leave, as in she asked for three months or six months leave in order to recover. It was always very short-term leaves with the idea, from her perspective, that at some point there would be some discussion about what would be appropriate to allow her to return to work. But she, you would agree that she was on leave for over a year? Yeah. I agree that she was, that she ended up being absent before she was first considered AWOL and then considered retired for over a year. And even in the administrative proceeding, right, there's a finding, complainant's medical provider would not say whether reassigning complainant would allow her to return to the workplace. So even if she received what she had asked, that there, no one was willing to testify that even then she could come back to work, right? Her medical provider wouldn't say that even with that reassignment she could work. And I think that, again, we're talking about timeframes, so we're talking about when that medical provider testified and the degree of what had happened. And we're also talking about, I believe, if I remember the record correctly, the medical provider was hesitant to say, this is exactly what she needs to do, but rather was saying, we can give it a try. Let's try something. I'm just reading what the administrative fact finder found when she was exhausting her claims in front of the EEOC. Right, right. And we dispute that was what the medical provider provided testimony on. So you're disputing that fact finding by the EEOC? Yeah, that she could not. That the medical provider stated this on the transcript? Yeah, that she could not perform any duties, that no job would be, she's not available for any job. What's our authority to review that, and what standard would it be under? You're not, you're not reviewing the administrative record. Your review, the district court, excuse me, the district court, the lower court, and I have, I'm almost out of time, so. You may respond. Okay. The district court is charged with reviewing the record as a full, not reviewing what the decisions made by the EEOC administrative process. Right, that's why I asked the question, what's the, on what basis can we review this fact finding, and what's the evidence that challenges it, and what would our standard of review be? It would be, it would be the, it would be de novo of the record, absent the EEOC, it would be the doctor's report, it would be the doctor's, the, the series of, of medical evaluations that were provided to give her short-term leave, it would be all of that put in context. Now, you're not arguing that the, the intervals of granting leave made her condition worse, are you? I'm arguing that the, the intervals were designed with the idea that this is short-term, and as the short-term went on, and there was no solution, there was no interaction, there was no discussion of accommodations on the part of the defendant, that her anxiety level became higher, and then once you get to October, January, that's when you have a point where she was considered, we're not sure what she can do, we, we should give it a try, but we don't know exactly what the accommodation would be. So you're saying that, had they given her what she requested, she never would have had a leave, leave extended, that's your view? Yeah, correct. If they had engaged in the interactive process, she might have been out of work for a month while that was, you know, put in place, and they tried out an, an accommodation to see if it worked, and then we would have gone, we all would have gone on with life. Thank you, Counselor. You have time reserved. Thank you. Ms. DeShields, minutes. Thank you, Your Honors. May it please the Court, Tyra DeShields on behalf of the U.S. Attorney's Office for the District of Maryland, on behalf of the appellee. Your Honors, a fair reading of this record only confirms the soundness of the District Court's judgment in this case, that Ms. Smith failed to meet the essential elements of her claims, and that there was no triable issue of material fact for her, and that, you know, the Court is not standing in the position of letting unsupported claims, claims and or defenses go forward with the trial, and this Court on its de novo review should reach the same conclusion. Let me start first with the failure to accommodate claim. That really is sort of at the, at the heart of this contention. Ms. Smith's request for accommodation was that she be reassigned away from Ms. Monger to a different supervisor, and that was the only properly exhausted accommodation related claim before the District Court, and now this Court. The District Court specifically found, and it is also in the lower record because it was not included in the EEO complaint, that telework was never exhausted as a reasonable accommodation. And in fact, if you go through the record, you will see that when Ms. Smith made her request, she made a request for reasonable accommodation, asked to be reassigned as of when she was talking to Kelly Keck, who was the EEO specialist and also sort of the disability rights coordinator, and he referred her to the HR office. She spoke with Ms. Lyles and asked for, asked for reassignment away from Ms. Monger. And then when she put in sort of the more formalized written request for accommodation on October 8th of 2013, she wrote specifically that she wanted to be reassigned away from Ms. Monger and that she preferred to have a permanent assignment and not a detail, and nowhere in there was there a mention of telework or a detail or an alternate work cycle. So the only thing that is before this Court is whether she should have been reassigned away to, and whether that was a reasonable accommodation. And it was not. An accommodation is supposed to be pegged to assisting a disabled person with performing the essential functions of their job. And here, Ms. Smith's request was not sort of rooted in her inability to do an essential function of her job. And, in fact, you just heard Ms. Appellant's counsel say that, well, maybe she could have done her job because she came, you know, she came to work a couple of times in between before she ended up taking this very, very lengthy leave that was granted to her by the Army. To hold that this kind of a request to just be switched from one supervisor to another under such circumstances. Well, maybe you can help me with this. Yes. I'm not making any judgments one way or the other because at this point we're not there. But it seems to me this is an accommodation that's a little different, I guess, than most. They normally come sort of in a hostile work environment situation. This is different. What she's saying is that her need for accommodation is 100% caused by harassing activity of her employer. Normally it's the other way. It's health or some other reason. That's the sine qua non in this case, which, right or wrong, I'm not making any judgments. I'm saying that's what this case is. She's saying that I can do my job fine. It's just because I'm being harassed by this person. And I can't do that. And it's causing me anxiety and problems and those things relate. That's what the related thing is. But if you stop doing this, then I can do that. So that's what her claim is. So is it a question of whether or not obviously you don't concede that she was harassed, do you? No, I do not. So that's a factual question for an allegation, isn't it? I mean, otherwise you don't. Otherwise, that's what she's saying, that basically. And that's why, in the sense that she was saying that there's intervals. I'm waiting for you to do something. And the waiting is waiting for you to transfer me somewhere else and get away from this person. Otherwise, I won't be able to do my work. And then finally, I think there are theories that after a while, maybe I can't do anything. I think that's what the medical person was saying because it's been so prolonged. Again, I'm not making judgment about it, but we have to first understand what the issue is. But see, like, that's the question. And that is, she says that I'm being berated and harassed and those things like that, and it's a hostile work environment and has turned it into a situation where I need accommodations. That's the claim. So, I mean, we've got to first get the apples and the apples aligned. I mean, so am I wrong about what she's saying? I'm fine. I'll be healthy. Fine. But it's you making me endure this situation with this person. And when I ask that you do something about it, you won't. So while you won't, I can do nothing but extend my leave. I mean, am I wrong about that? That's the theory in this case? Tell me that first before you answer that. Am I wrong? Because I may be wrong. That's why I'm asking. You know the record better than me. It may be her theory of the case, but she was not subjected to a hostile work environment. I know that. That's a factual question. I'm not making the judgment that she was. I'm just saying that is what this case is about, right? Am I wrong? What this case is about, Your Honor, is whether she made a request for a reasonable accommodation and also whether she actually met the elements to sustain a claim of failure to accommodate. This was not a case where the Army failed to engage in the interactive process. Ms. Smith was essentially unable to perform the functions of her job, and that started on April 29th of 2013 when she had this encounter with Ms. Monger that she says caused her to have a panic attack when her supervisor said that she was tardy for a meeting that she was supposed to attend with Ms. Monger and another individual. She was late to that meeting, and Ms. Monger called her on it to collapse into a colloquialism, and then Ms. Smith said that she had a panic attack. And then from there, she actually went to patient first. And if you look in the record, there's a doctor's note from Dr. Mendoza who indicated that Ms. Smith was diagnosed with panic attacks, with anxiety, and that it was indefinite until further evaluation as to the nature of the duration of her condition. Ms. Smith did return to work on April 30th. I mean, I'm sorry, on May 1st and May 2nd to attend some sort of retirement training, planning, or some such, and then came to work on a few isolated occasions in May before she submitted her request for voluntary leave for participation in the Voluntary Leave Transfer Program on May 16th. And the agency granted, or the Army granted that request, and thereafter Ms. Smith just continued to ask for more and more leave. Now, it is true that the Army said, initially said that with regards to the reassignment itself, they wanted to do this internal investigation to basically to find out the facts and to determine what was appropriate. And the chief of staff, Karen Taylor, made that, quote, unquote, a top priority that's there in the record, and she directed that the internal investigation be completed as soon as possible. And it was. It was started on May 7th, and it was completed on July 11th. And all through that time, Ms. Smith was the person who was asking for leave, and she was granted leave. And finally, she was submitting notes, and none of those doctor's notes suggested that she was in any way or in any way capable or shape to perform the essential functions of her job. This was not a situation where, oh, if you just assign me over to here, I will be able to perform the job. Ms. Smith, I will point out to you, also applied for disability benefits. She submitted documentation when she applied for the Voluntary Leave Transfer Program, and also when she was seeking leave without pay, all of which said, same doctor's notes, that she was not able to perform the functions of her job. And then Dr. Glanville, this was, unfortunately, the doctor's note that she supplied or the report that she supplied in connection to questions that were put forth to her by the Army is undated. But what she indicated in that report was that Ms. Smith was unable to perform any job. She had short-term memory, cognitive impairment, she could not concentrate, she had lapses in attention, she suffered panic attacks, and I stress to you, she said again, she will not be able to perform any job, any function of her job. And it is simply not in accord with the record that Dr. Glanville said that, oh, well, let's just wait and see as to whether or not the reassignment will allow her to perform the functions of her job. What Dr. Glanville said is that I won't speculate as to whether her condition will improve with reassignment. So what is the Army supposed to do in that case as they're trying to figure out whether a reassignment will work for this person or whether there should be some alternate solution that's applied? Ms. Smith was on leave for well nigh close to a year. And the agency still granted her leave without pay extensively, finally made the decision to put her on AWOL status because it was mission essential. She had to be able to do the job. She wasn't able to do the job. So she was not a person who is otherwise qualified. And so she doesn't satisfy that element of her failure to accommodate claim, even if you don't find that her request to be moved to a particular supervisor isn't, you know, something that is, you know, as a matter of law, is not a reasonable accommodation. Counsel, when did she first make a request to be transferred to another supervisor? I believe she made that request when she met on the same day as the encounter, April 29th of 2013, when she met with an individual by the name of Kelly Keck. Right. And she said at that point that it was not in any way attributable. She couldn't figure out, she did not know that there was a basis rooted in discrimination for it. She just wanted to be transferred. And Mr. Keck referred her to the HR individual. I thought it wasn't really clarified until the fall whether this was an accommodation request, that there was initial sort of personality disagreements. There were informal requests at the office. There was the statement, I don't have a basis for thinking there's any discrimination behind it. But then Mr. Keck, in it looks like September, specifically asks, you know, are you making an accommodation request? And then a couple days after she says yes, then he followed up with, well, we're going to need this particular medical documentation. We're going to need, you know, to follow up on that accommodation request and participate in that process. And then she provided that information in December. That is correct, Your Honor. All of that is correct. Okay. I'm losing where the lack of, they argue that the Army didn't participate in the interactive process. But it looks like that process begins in September when she formally requests an accommodation. When she makes formally requests. Because up until that point, it was equivocal, ambiguous as to whether or not that doesn't count under the law that the employer is sufficiently put on notice that the person is requesting a reasonable accommodation. So when in September she makes that request to Mr. Kelly Keck and then she starts submitting the documentation in support of it, that is when, you know, the agency is also trying to figure out what can we do, what can we do about this. Please keep supplying each time that she applied for leave. Please show us the documentation that supports whether or not you're able to return to work. And that documentation just simply was absent up until the point that the Army had to make the decision for mission-critical purposes that she would either be put in an AWOL status, and if she did not return to work, she would be put in an AWOL status. And even then, when she was put in that AWOL status on January 6th of 2014, the Army didn't make the decision in the form of a notice of proposed removal until March. So she was given plenty of time to demonstrate that she could return to work to perform the essential functions of her job, and simply the evidence she did not. So I guess it's your position that when the final, the request for accommodations, I think she was October 8th or something like that. That's the written request. During her formal request for accommodations, during the same time, you had a letter from her doctor saying that there's no job that she can perform. Correct. So because of the medical documentation, there's no job that she can perform, then even sending her back and changing her supervisor would not matter because the doctor says there's no job she can perform. Correct, Your Honor. That is correct. And let's keep in mind, too, that the strongest, most compelling evidence on this point comes from Ms. Smith herself in the form of the doctor's notes that she supplied. And indeed, in her deposition testimony in this case, during the discovery process at the lower court level, the district court level, in January of 2023, she said that she still was not working simply because she did not want to have or she was afraid that she would have another supervisor like Ms. Longer, who, by the way, I think, just to revert to the hostile work environment claim, this case is on a spectrum, I think, that's closer to DaCosta versus Becerra than it is to anything else. And there, if you recall, that was a situation where DaCosta's supervisor, she said, treated her disdainfully, spoke to her contemptuously, put her on what would be considered a performance improvement plan, gave her sort of a letter of expectancy about what her performance should be, and said that, you know, would meet with her, berated her and whatnot. And this court there said that that was not sufficient to establish severity or that it was pervasive, and so that element of hostile work environment was not met. And that is the same case here. Ms. Smith's all of the things that she catalogs as contributing to a hostile work environment really can be cataloged or captioned under the heading of, this is just simply a personality discord between two individuals, a supervisor and a subordinate. I see that I have about five minutes left in my time. I just simply also wanted to touch on, Your Honors, the interference claim. And with regard to that interference claim, I think that it fails for two reasons. First, the record evidence does not show that the acts complained of by Ms. Smith as constituting interference or intimidation were actually done on account of her protected activity, and that is to say that these acts would have been undertaken to thwart her participating or engaging in protected activity. And secondly, there's no record evidence that supports an inference that the acts complained of were actually motivated by an intent to discriminate. Now, Ms. Smith seeks to fill the gap with these unsupported conclusions that are basically mere surmise and which the law does not and should not countenance as sufficient to make out this kind of a claim. And moreover, to accept Ms. Smith's interpretation of what is interference or intimidation, for example, this perceived delay in responding to the reassignment accommodation request, Ms. Monger stopping by her desk in the morning and keeping a work schedule that's similar to Ms. Smith's, the deactivation of Ms. Smith's badge and access to her work computer while she was on extended leave, would do what is explicitly not envisioned by the interference standard, which this Court discussed but did not expressly adopt in the Kelly v. Tanova-Abingdon case. You would basically be turning any action that whatsoever in any way, however tenuously, hinders a member of a protected class into some sort of interference or intimidation, and that simply can't be a logical extension of the law. And in fact, the Army's actions in this case cut against any finding that it tried to prevent Ms. Smith from exercising her protected rights or did so with an intent to discriminate, and a fair reading of the record shows that the Army repeatedly requested updates on Smith's medical status to determine what could best be done regarding her accommodation request, and it accommodated her over many months by authorizing the leave that she requested. In sum, the record simply fails to generate a triable issue of material fact respecting the interference claim or any of the claims dismissed on summary judgment or on the Army's motion to dismiss. And with regard to the retaliation claim, I will just say that the district court did not misapply. That's standard with respect to retaliation. The district court followed what was this court's understanding of Burlington, and in Burlington, of course, what was discussed there is what constitutes a materially adverse action is something that would dissuade a reasonable employee from engaging in protected activity or making a charge of discrimination. And what the Supreme Court said in Burlington in trying to sort of flesh out, well, what exactly does materially adverse actually mean, it set up the construct. We're not talking about minor trivial things. We are talking about significant harm, and that is something that this court discussed at length in the Israelite opinion and which the district court followed faithfully. And if there are no other questions that are to be asked by the court, I will yield my time and simply ask that you give a fair reading of the record, and when you do so, you will be compelled to award judgment or to affirm the judgment of the district court in this case. Thank you, Counsel. Thank you, Your Honor. Ms. Craft, you have some time reserved. Yes, ma'am. Thank you. I first want to begin with the interference claim that counsel just spoke about. Well, let me back up. I apologize. The Army is making a very clear distinction between an informal request for an accommodation and a formal request for an accommodation. It seems to be tied to making the connection that it's an accommodation for a disability, right? I think the district court called it making the logical bridge so that the Army knows, oh, now we're in accommodating a disability territory, and there are rules and procedures we have to follow when it comes to that. So it may not be so much as formal versus informal as it is, is this an accommodation for a disability that's being requested, or are we being presented with an employee who's requesting a change in their position for some other reason? Sure. When was that logical bridge created? When did the plaintiff explain to the Army that I'm requesting a different supervisor because of my disability? And I think she did that shortly after April 29th. I believe it was on May 2nd or May 7th. I may have the dates mixed up. She submitted a fairly lengthy letter to Carrie Keck, who was the disability coordinator for ATEC, for that chapter, Chief Division of the Army. And she did not say, I'm requesting a 15-6 hostile work environment. I'm requesting an accommodation. She didn't use any terms that should have delineated that into any category. She listed things that were happening. She listed the fact that she had a disability, that she had PTSD and anxiety, and that the work environment was. And when was that that she listed the diagnoses? That was in the May communication to Carrie Keck. Was it the May 2nd email? She said, I had a panic attack. No, there's one where she attaches to an email communication to, because Mr. Keck gave her information. He said, write up what happened. Give it to me. So she wrote up a memo of what happened and what she was asking for. She did not say, I'm asking for a 15-6 investigation to be done to determine if Ms. Monger somehow acted inappropriately. She simply said, I have a disability, I have PTSD, I have anxiety, and this is what's happening to me, and this is the consequence. So because of Mr. Keck's role as the disability manager in the EEO department of ATAC, he had the discretion, and it's my understanding, we don't have his records. Can you give me a site for that? I mean, I'm seeing this email saying, you know, I had a serious panic attack on April 29th and had to take some medication, missing work due to my anxiety. Where is it that she says, I have a disability and I need an accommodation for it, or even something close to that? Is that a memo format or is that just an email that you're reading from, the May 2nd? I assume it's the email that she sent. Okay. There's a memo that is throughout. Tell us where it is on the record. Okay. I believe it is going to be...  I have a series of sites, JA559, JA885, 254, and 276. Which one of those is the memo? I'm not certain which one is the memo. You want to take a look and tell us? You said 55, what was the first one? 559. 559. It's like... It's like a transcript. Yeah, that's a transcript. That's a transcript. That's a transcript. Okay. 885 is the EEO proceeding. I can find that one. Counsel, this is critical to your case. I understand. I understand.  That's the EEO proceeding. And then this is a September email. I don't see a May memo in any of those. I looked at those four citations. Counsel, if you can't find it, I know you're under a lot of pressure now to try to find it. But if you can't, there is a 28-J procedure that we have. Thank you. And I suggest you avail yourself of that if it exists. So you're saying that it does exist? Yes, it does exist. There is a memo that she gave to Kelly Keck, who then referred her to HR. And she advised them of her condition, right? Yes. And that's not in September? No. No, that was in May. All right. I didn't find supportive citations for many propositions in your brief. So if there is a supportive citation for this one, 28-J would be a good idea. Thank you. All right. The informal and the informal process, again, it's that delay between what happened. And there are many times in which HR or Kelly Keck, EEO, contacted the supervisors and said, are we going to look at accommodations? Are we going to move her? What are we going to do? And the answer was always not until the 15-6 is completed. And I think that would thwart any reasonable person from continuing to ask for. So that goes to the interference issue. Ms. Craft, can you address this in terms of, I think I asked counsel, your worthy colleague was very detailed about what she says in terms of front lines. So as I understand, she cited one incident that was about your client coming in late or something. Somehow there was a situation, an encounter, whatever that is, that event. And that's the only one cited. The rest of it is sort of what happened after that in terms of your. Are there other instances other than that one day that would be the basis of what you would call, as you say, triggering events? Yes. There was an incident in February in which she berated people in front of, or she berated Ms. Smith in front of her colleagues. Berating is a nice big word, but it's a word that people like me, like just common sort of people, just everyday people. What does that mean? What did she do? It means that she questioned whether she was reliable, questioned whether she was doing her job properly, questioned whether she wanted to work for her job, made comments such as, and directed it towards Ms. Smith. In front of other people. In front of other people. And one incident on the 29th was in front of not a, someone who was working with the organization but not within Ms. Smith's organization. Let me ask you this, though, because you have a disability discrimination case and a hostile work environment based on disability. How are you connecting this behavior by the supervisor to her disability? We're connecting it because in. Did she say something regarding the disability? I mean, what does she do in terms of the discrimination? What does she do in terms of the hostile work environment to link it to her disability? If it were as simple as you're not working because you have a disability, that would be an easy connection to make. It was more nuanced than that. It was knowing that when Ms. Smith was confronted, especially the way that Ms. Monger confronted her, that it could cause a panic attack. There had been a previous panic attack the year before, and Ms. Monger observed it, and she observed what the symptomology were, the shortness of breath, not being able to breathe. And Ms. Monger mockingly asked if she should call 911. So it's more about tone of voice at certain times that connect it to the disability. Knowing that she had asked for a reassignment, and she comes back in the very next day, and you're sitting there waiting for her, knowing that that's going to trigger, that's the disability discrimination. Well, I thought she said she was there waiting on her because she was late for work. That's one of the reasons they have given. Then, however, there's nothing a week prior, and Ms. Smith did not have access to this, but a week prior a performance review had been completed. There was no discussion of untimeliness. There was no discussion of work completion not being done. I mean, it was a glowing report. So how she went from being this lackadaisical, unresponsive, irresponsible employee on April 24th to being this wonderful employee who's very conscientious, who does her job well, who's doing everything great, to then on the 29th, five days later, she has a history of showing up late. She doesn't want to work for a paycheck. She's lazy. She doesn't want to walk by my desk in the morning, so she takes the stairs, things of that nature. And all of those are connected to her disability in the sense that she has claustrophobia, so the stairs were necessary so she didn't have to take the elevator. So there are those connections that make it the disability-related claim. Now, I think that... I understand you're saying it's related, but I guess what I'm asking is, how are you showing allegations where you're saying that it's based on her disability, not what came, but how is the discrimination based on her disability? Everything that they did on the 29th forward was based on the fact that they viewed her as someone who was mentally ill and unstable. They restricted her access into the building. She had to be escorted into the building for, if she came into the building, to work on her EEO claims. At one point, it was asked if the staff would be given training on active shooter because Amanda still had an EEO claim, an existing EEO claim, and who knows what could happen. So there are things that are directly related to her mental health and their concern about her mental health and disability that are connected. Was there a standard practice for people that were on leave in terms of having access to the building? There was not. There are instances where other people had their computers with them or were allowed to telework, not necessarily if they were on sick leave, but were able to telework. In fact, Ms. Smith herself would take her computer home with her and do work on the evenings and weekends as everyone else did. And I see I'm extremely over time, and I apologize for that. If there's any other questions, I will include the 28J and submit on the brief. All right. Thank you, counsel, both counsel. And we'll come down, counsel, and then go to our last case for the day.
judges: Roger L. Gregory, Allison J. Rushing, DeAndrea Gist Benjamin